# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | |
|---|---|
| LARRY D. HUDSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) CAUSE NO. 1:19-CV-133-PPS |
| | ) |
| ANDREW M. SAUL, | ) |
| Acting Commissioner of the Social Security | ) |
| Administration, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Larry Hudson appeals the Social Security Administration's decision to deny his

application for disability insurance benefits and supplemental security income. During

the hearing before the ALJ, Hudson largely complained about pain in his feet and

knees, as well as depression and anxiety. Ultimately, the ALJ found Hudson had the

severe impairments of: degenerative disc disease, peripheral neuropathy, obesity

(Hudson was 5'10" and weighed 298 pounds at the hearing), depression, and

generalized anxiety disorder. [Tr. 15.][1] The ALJ also determined that Hudson was not

disabled, he had the residual functional capacity (RFC) to perform light work with some

postural restrictions, and that Hudson "remains capable of understanding,

remembering and carrying out simple instructions and tasks, making judgments on

simple work-related decisions, dealing with routine changes in a routine work setting

---

[1] Citations to the record will be indicated as "Tr. __" and indicate the pagination stamped at the
top right of each page of the record (found at DE 18).

and responding appropriately to usual work situations." [Tr. 19.]  The ALJ also found that Hudson could "respond[] appropriately to occasional interactions with co-workers, supervisors and the general-public."  *Id.*  Because I find that the ALJ properly analyzed Hudson's RFC and made a proper determination at Step Five, I will affirm the ALJ's decision**.**

## Discussion

I'll start, as usual, with the standards that govern my decision-making in this appeal. My job is not to determine from scratch whether or not Hudson is disabled. Rather, I only need to determine whether the ALJ applied the correct legal standards and whether the decision is supported by substantial evidence.  *See* 42 U.S.C. § 405(g); *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012); *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010); *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008).  The review of the ALJ's decision is deferential.  This is because the "substantial evidence" standard is not particularly demanding.  In fact, the Supreme Court announced long ago that the standard is even less than a preponderance-of-the-evidence standard.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  But there has to be more than a "scintilla" of evidence. *Id.*  This means that I cannot "simply rubber-stamp the Commissioner's decision without a critical review of the evidence."  *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).  Nonetheless, the review is a light one and the substantial evidence standard is met "if a reasonable person would accept it as adequate to support the conclusion." *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004).

Hudson sets forth two arguments in support of remand: (1) the ALJ failed to incorporate all of Hudson's limitations in the RFC; and (2) the ALJ erred at Step Five because the vocational expert's (VE) opinion about the national numbers of available jobs Hudson could perform was the result of a defective and disapproved methodology. [DE 20 at 5.] Each argument will be addressed in the order it was presented.

## I.    Whether the ALJ Properly Assessed Hudson's RFC

Generally speaking, both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010). This includes any deficiencies the claimant may have in concentration, persistence, or pace. *Id.*

Hudson contends the ALJ failed to incorporate limitations from all of his medically determinable impairments (severe and nonsevere), into the RFC. [DE 20 at 15-19.] In support, he cites to *Yurt v. Colvin*, 758 F.3d 850 (7th Cir. 2014), and argues the ALJ's hypothetical and RFC fail to reflect Hudson's moderate limitations in concentration, persistence and pace. Hudson believes that the ALJ's limitation to simple tasks and decisions, and routine changes in the work settings, was insufficient under *Yurt* to account for Hudson's moderate limitations in concentration, persistence and pace. In support of this argument, Hudson merely states that the "ALJ acknowledged that things such as depression, anxiety, and good and bad days interfered with CPP factors" therefore, it was "odd" that the ALJ "placed no CPP

3

limitations in the RFC." [DE 20 at 17.] Hudson additionally urges that even though the ALJ limited him to occasional interaction with supervisors, coworkers, and the general public, the ALJ improperly failed to place any limitations on the nature, intensity, or quality of his expected work interactions with others. [DE 20 at 17.]

As noted at the outset of this opinion, the ALJ found Hudson had "moderate" limitations with the ability to sustain social functioning and with regard to concentrating, persisting, or maintaining pace (which encompasses the ability to focus on work and stay on-task). [Tr. 18.] In *Yurt*, the Seventh Circuit rejected a hypothetical that merely confined the claimant to "unskilled work," finding that "we have repeatedly rejected the notion that a hypothetical like the one here confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace." 758 F.3d at 858-59. But in this case, the ALJ included *much* more analysis than that in *Yurt*, and both the RFC and hypothetical are more comprehensive and detailed, and account for Hudson's limitations. Indeed, they expressly limit Hudson to jobs that only require he perform simple instructions and tasks, make judgments on simple work-related decisions, occasionally interact with co-workers, supervisors, and the general public; and deal with routine changes in a routine work setting. [Tr. 19, 322-323.]

I do think that the ALJ included all of Hudson's relevant limitations into the RFC and hypotheticals. For example, the ALJ acknowledged that Hudson testified at the

hearing that he had depression and anxiety, and he reported difficulties with memory, completing tasks, concentration, and understanding. [Tr. 17, 152, 293.] But the ALJ also highlighted the fact that Hudson's only documented attempt to obtain mental health counseling occurred in 2010, was of very short duration, "and it occurred not primarily due to a need for treatment but rather, in part, to assist his prior claim of disability, as suggested by claimant's counsel at that time." [Tr. 17.] The ALJ found that overall, the medical evidence revealed that Hudson had a reasonably intact memory. [Tr. 17, 115-122, 147-54, 155-63, 175-80, 181-84, 186-92.] For instance, the ALJ cited Hudson's 2015 psychological consultative exam, which revealed essentially minimum to unremarkable clinical findings, and Hudson's judgment was only moderately below normal. [Tr. 17, 181-84.] Similarly, she noted that Hudson's September 2015 physical consultative exam showed a normal attention span and intact recent and remote memory. [Tr. 17, 175-80.] The ALJ further recognized that Hudson's mental health treatment records from May 2016-June 2017 reflected no clinical findings/observations for mental health deficits on exams. [Tr. 17, 193-221.]

The ALJ discussed other evidence as well showing that Hudson did not have more than moderate difficulties in concentration, persistence, or pace. Hudson could watch television (NASCAR racing) for a one-hour program, could drive, shop, visit the post office, cook simple meals, count change, pay bills, and handle a checking/savings account. [Tr. 19, 21, 147, 150-51, 316.] The ALJ found that Hudson could follow simple

instructions and directions, and he was sufficient with the ability to handle stress and changes in his routine. [Tr. 19.]

The ALJ also supported her findings that Hudson only had moderate difficulties with the ability to sustain social functioning/interact with others with evidence in the record. [Tr. 18.] She acknowledged that Hudson's depression and anxiety made it difficult for him to be around more than four to five people, and caused him to become overwhelmed. [Tr. 17, 293, 295.] However, the ALJ also noted that Hudson was able to go out alone, and he could spend time in public shopping and at the post office. [Tr. 19, 118, 150.] Finally, the ALJ mentioned that Hudson visits with his relatives, and he reported no problems getting along with authority figures. [Tr. 19, 120-21.] Based on all of this evidence, the ALJ properly determined that Hudson had some difficulties with social functioning, but no more than moderate difficulties in this area. [Tr. 18.] While Hudson alleges in his memorandum that his medications detract from his ability to concentrate [DE 20 at 18], the ALJ observed that his mental health treatment records from May 2016-June 2017 reflected no clinical findings/observations for mental health deficits on exams. [Tr. 17, 193-221.]

The ALJ used all of this information to evaluate Hudson's RFC, which she determined was as follows: Hudson remains capable of understanding, remembering and carrying out simple instructions and tasks, making judgments on simple work-related decisions, dealing with routine changes in a routine work setting and responding appropriately to usual work situations. She also found Hudson remains

capable of responding appropriately to occasional interactions with co-workers, supervisors and the general-public. [Tr. 19.] At the hearing, the ALJ asked the VE to consider a hypothetical question derived from this RFC finding. [Tr. 322-23.]

In preparing the hypothetical and RFC, the ALJ appropriately relied on state agency psychologist consultants, and accepted their determination for moderate limitations in the ability to sustain social functioning and in concentration, persistence or pace. [Tr. 18.] The ALJ recognized that these opinions were given before the implementation of the Final Rule concerning the Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66138 (published September 29, 2016, effective January 17, 2017), and that the revised criteria for evaluating mental disorders with regard to the "A," "B," and "C" criteria are now different. [Tr. 17.] The ALJ gave these opinions some weight, noting she accepted the state agency psychologists' determination that Hudson had only moderate limitations in the ability to sustain social functioning and in concentration, persistence or pace. [Tr. 17-19.] However, the ALJ additionally found that Hudson had a moderate limitation in understanding, remembering and applying information, acknowledging that his reports of ongoing anxiety more likely than not resulted in some reduction in this functional area, and a mild limitation in his ability to adapt or maintain himself. [*Id.*] She also noted that evidence established after November 2015 did not demonstrate significant worsening, or the need for mental health counseling or therapy. [Tr. 18.]

The ALJ's RFC and hypothetical are supported by medical evidence in the record. She relied upon the opinions of the state agency psychologists, as well as medical documents in the record, and Hudson's own testimony. I believe the ALJ fully explained the reasons and supporting evidence for her finding of moderate limitations with regard to concentrating, persisting, or maintaining pace, and sufficiently included in the RFC and hypotheticals the limitations that Hudson was capable of understanding, remembering and carrying out simple instructions and tasks, making judgments on simple work-related decisions, dealing with routine changes in a routine work setting and responding appropriately to usual work situations, and that he remained capable of responding appropriately to occasional interactions with co-workers, supervisors and the general public. [Tr. 19.] This scrutiny, analysis, and explanation is adequate. *See, e.g., Jozefyk v. Berryhill,* 923 F.3d 492, 498 (7th Cir. 2019) (upholding RFC of moderate limitation in concentration, persistence, or pace, where it adequately accounted for the claimant's psychological symptoms); *Guntle v. Saul*, 1:19-cv-103-PPS, 2020 WL 582765, at *2-3 (N.D. Ind. Feb. 5, 2020) (affirming finding of moderate limitations with regard to concentration, persistence, or maintaining pace which were sufficiently included in the RFC and hypotheticals); *Nicholas B. v. Saul*, No. 18-2217, 2019 WL 7500242, at *4 (C.D. Ill. Oct. 8, 2019) (finding the ALJ did account for moderate limitation in concentration, persistence, or pace where the ALJ found the plaintiff could interact with others, persist in activities, and understand and follow directions); *Woods v. Berryhill*, No. 1:16-cv-108-SLC, 2017 WL 4325302, at *6-7 (N.D. Ind.

Sept. 29, 2017) (finding the RFC and hypotheticals did adequately account for moderate deficits in concentration, persistence, or pace).

As another court in this district recognized, even though a claimant might have moderate limitations in a particular functional category related to concentration, persistence, or pace, that does not necessarily mean that the claimant cannot function satisfactorily. *Capman v. Colvin*, 1:13-cv-286, 2014 WL 4494421, at *6 (N.D. Ind. Sept. 12, 2014). Here, the ALJ properly analyzed and concluded that Hudson's moderate limitations related to concentration, persistence or pace did not preclude him from functioning satisfactorily, but the ALJ still addressed Hudson's issues by minimizing the skill, judgment, interaction, and changes required in his job. Based upon the evidence before me, I find that the ALJ did adequately account for Hudson's moderate limitations in concentration, persistence, or pace in the RFC and hypotheticals posed to the VE.

Hudson also makes a perfunctory argument that the ALJ erred when accounting for the quality of his interaction with others. [Tr. 20 at 17-18.] She limited Hudson to occasional interaction with supervisors or coworkers, but Hudson finds fault that "no limitation [was] put on the nature and intensity or quality of [Hudson's] expected work interactions with others." [*Id.*] Hudson does not point me in the direction of any case law which requires the ALJ to describe the nature, intensity, or quality of the interaction between the claimant, supervisors, coworkers, or the general public. While it is true that the ALJ did not address the "quality" or nature of the interactions between Hudson

and his coworkers or supervisors, the ALJ did limit him to unskilled work at light exertion, such as a hand packager, a mail sorter, or a housekeeper. [Tr. 23.] It seems to me, and the rulings reflect this, that unskilled work requires less social interaction than work in higher skill categories. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2 §§ 201.00(I), 202.00(g) (explaining that unskilled work generally involves working with objects rather than people (or data)); SSR 85-15, 1985 WL 56857, at *4 (same). Moreover, the ALJ went above just assigning unskilled work, and added the additional limitation that Hudson should be limited to only occasional interactions with the general public, supervisors, and coworkers. [Tr. 19.] Hudson has not shown anything in the medical record demonstrating that he needs greater social interaction limitations. *See Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011) ("The claimant bears the burden of submitting medical evidence establishing [his] impairments and [his] residual functional capacity."). Moreover, the ALJ found that Hudson only had moderate limitations in social interaction, and supported this conclusion with the fact that Hudson lived with his mother, went out alone and spent time in public shopping and handling affairs, visited with relatives, and reported no difficulties getting along with authority figures. [Tr. 18-19, 115, 118, 120-21,147.]

Hudson also argues that the ALJ improperly failed to consider his PHQ and GAF scores.[2] [DE 20 at 18.] However, the Seventh Circuit has noted that since July 2014, the

---

[2] Although Hudson states the ALJ failed to consider his PHQ and GAF scores, he then only provides argument about the GAF scores. [DE 20 at 18.] Therefore, I'll restrict my analysis to the GAF scores as well.

American Psychiatric Association has eliminated the GAF scale from its Diagnostic and Statistical Manual of Mental Disorders, because it is unreliable. *Cole v. Colvin*, 831 F.3d 411, 413 (7th Cir. 2016); *Voigt v. Colvin*, 781 F.3d 871, 874 (7th Cir. 2015). As such, it was clearly not error for the ALJ to omit discussion of Hudson's GAF scores.

Hudson also briefly attacks the ALJ's physical RFC assessment, arguing she committed error when she assessed Hudson's ability to handle, finger, and feel, and his ability to stand. [DE 20 at 19.] However, the ALJ did properly acknowledge Hudson's September 30, 2015 physical exam, where he presented with a limping gait, but his posture was normal, he did not need an assistive device, and he had the full 5/5 upper/lower muscle strength. [Tr. 21, 175–78.] The ALJ discussed that not only did Hudson have full upper/lower muscle strength, but his grip strength was also full at 5/5; he retained fine/gross manipulations; there were no neurological deficits; no edema; no muscle atrophy; and, despite allegations related to his knees, no crepitus of the knees. [*Id.*] The ALJ noted that on the follow-up, the examiner did not cite any restrictions or functional limitations. [Tr. 21, 185.] The ALJ went on to consider that while exam notes from February and March 2016 did document some hypoesthesia, weakness and reduced grip strength, Hudson's May 2016 EMG study was negative for any abnormality, and these findings were not documented over multiple exams before or after. [Tr. 21, 195.] The ALJ stated that treatment records from Hudson's treating family physician noted several of his mild conditions/symptoms along with obesity; however, other than some foot tenderness, Hudson's physical findings on exams from

February 2016 to June 2017 were generally unremarkable, and even included reported improvement with conservative treatment involving use of medications absent report of side effects. [Tr. 21, 193-221.] The ALJ also remarked that while Hudson alleged numbness of the hands/feet, and a daily feeling of being overwhelmed by a tingling/pins and needles sensation and hand cramping, in June 2017, he reported improvement with prescribed Gabapentin. [Tr. 20, 193-221.]

Hudson bears the burden of providing evidence that establishes the degree to which his impairments limit his RFC. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). In this case, he only points to a few medical facts in the record that the ALJ already specifically considered when she formulated the RFC. Hudson does not offer any new evidence or legal authority in support of his argument; but instead, asks me to re-weigh the evidence - which I am prohibited from doing. *See Powers v. Apfel*, 207 F.3d 431, 434-35 (7th Cir. 2000). The ALJ properly formulated the RFC based upon the substantial evidence she described in her opinion, and there is no evidence that she failed to properly weigh Hudson's ability to stand and to use his hands/fingers in finding he could perform light level work.

## II.    Whether the ALJ Made A Proper Step Five Determination

This argument is a bit convoluted, but Hudson basically argues that the ALJ's Step Five determination is flawed because the VE's opinion about the national numbers of available jobs that Hudson could perform was based on an improper methodology. [DE 20 at 19-21.] Essentially, Hudson argues that the VE used an equal distribution

methodology to allocate from the broad Standard Occupational Classification (SOC) categories to the narrow Dictionary of Occupational Titles (DOT) categories. Hudson claims the Seventh Circuit disapproved of this type of methodology in *Alaura v. Colvin*, 797 F.3d 503, 508-08 (7th Cir. 2015), and *Browning v. Colvin*, 766 F.3d 702, 708-09 (7th Cir. 2014).

In this case, the ALJ posed a hypothetical to James Breen, the VE, to determine whether jobs existed nationally that Hudson could perform. [Tr. 320-32.] The VE testified that, given Hudson's age, education, work experience, and RFC, he would be able to perform the requirements of representative occupations such as hand packager (DOT 559.687-074) (119,000 national jobs), mail sorter (DOT 209.687-026) (72,000 national jobs), and housekeeping (DOT 323.687-014) (560,000 national jobs). [Tr. 324.] During the hearing, Hudson's counsel objected to the job numbers on the ground that the VE's methodology for determining job numbers was unreliable, and the ALJ overruled the objection. [Tr. 329-32.] I have reviewed the VE section of the ALJ hearing in great detail, but have to admit that it is a little confusing as to whether the VE actually used the equal distribution methodology (which Hudson criticizes). Even assuming that the VE did use this specific methodology in this case, that would not necessitate remand.

As the Seventh Circuit has noted in *Chavez v. Berryhill*, 895 F.3d 962, 968 (7th Cir. 2018), the Commissioner has not promulgated regulations that prescribe any specific methodology for VEs to use to estimate how many jobs are in a particular occupation.

Further, the Seventh Circuit held in that case that it was *not* prohibiting the use of the equal distribution methodology so long as the VE could justify its usage. *Id.* at 970. And yet, Hudson is right that the Seventh Circuit has also "recently expressed concern with the source and validity of the statistics that vocational experts trot out in social security disability hearings." *Alaura*, 797 F.3d at 507. The Court in *Alaura* elucidated the issue as follows:

> The problem appears to be that the only reliable statistics are census data for broad categories of jobs, rather than for jobs in the narrower categories that the applicant for benefits is capable of doing. Typically, it appears, the vocational expert simply divides the number of jobs in the broad category that includes the narrow category of jobs that the applicant can perform by the number of narrow *categories* in the broad category, thus assuming that each narrow category has the same number of jobs as each other narrow category - which is preposterous. A vocational expert's stated number of jobs in a narrow category seems likely, therefore, to be a fabrication.

*Id.* at 507-08 (emphasis in original) (citation omitted).

But aside from the Seventh Circuit recognizing a problem with the reliability of the statistics relied upon by VEs, that Court has not mandated any specific action or results. The language is all dicta. *See Adamec v. Berryhill*, No. 15 C 11811, 2017 WL 1196920, at *6 (N.D. Ill. Mar. 31, 2017) ("[T]he Seventh Circuit's repeated criticism of the use of the DOT in VE testimony, while pointed, was merely *dicta* and does not merit remand."); *Boyles v. Acting Comm'r of the SSA*, 1:17-CV-131-TLS, 2018 WL 1250866, at *5 (N.D. Ind. Mar. 12, 2018) (collecting cases holding that *Alaura*'s criticism of VE methodology was dicta); *Brace v. Berryhill*, 1:18-cv-216, 2019 WL 1397474, at *4 (N.D.

Ind. Mar. 28, 2019) ("Had the Seventh Circuit intended the equal distribution method to be ruled impermissible, it would have said so.  Thus far, it has not.").  Hudson has not cited any case in which the Seventh Circuit has reversed on this basis alone, and I am not aware of any.  Nor has Hudson offered any argument, or made any showing, to suggest that the VE's numbers were not accurate.  Hudson also has not shown how many numbers of jobs might be available for Hudson under a different methodology, or how this analysis could alter the outcome of this case.  Therefore, there is no basis for remand on this issue.

The Seventh Circuit precedent as set forth in *Donahue* remains good law: "[i]f the basis of the vocational expert's conclusions *is* questioned at the hearing, however, then the ALJ should make an inquiry (similar though not necessarily identical to that of Rule 702) to find out whether the purported expert's conclusions are reliable."  *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002) (emphasis in original).  In this case, the ALJ did acknowledge Hudson's counsel's objection to the VE's methodology, and she did ask the VE whether any part of his hearing testimony was inconsistent with or in conflict with the DOT or its companion publications (to which the VE answered no). [Tr. 331-32.]  What's more, the VE testified about the reliability of the job numbers by explaining how he obtained his DOT numbers from the U.S. Publishing and labor market statisticians, employer reports, the U.S. Department of Labor, and the U.S. Census Bureau, and then used a common VE tool to exchange those for DOT codes. [Tr. 329-30.]  Therefore, the VE did provide a detailed explanation of his methodology, and I

can't imagine what additional information the VE could have given her about the job numbers. Any error committed by the ALJ in not inquiring further is harmless since the VE fully explained his methodology. *See Lawrence v. Astrue*, 337 F. App'x 579, 586 (7th Cir. 2009).

## Conclusion

For the reasons set forth above, the final decision of the Commissioner of Social Security denying Plaintiff Larry Hudson's application for supplemental security income is **AFFIRMED**.

The Clerk shall enter judgment in favor of Defendant and against Plaintiff.

**SO ORDERED**.

ENTERED: March 26, 2020.

/s/ Philip P. Simon
**PHILIP P. SIMON, JUDGE**
**UNITED STATES DISTRICT COURT**